[No. 21224.    Department One.    March 11, 1929.]

EDWARD M. STORWICK, *Respondent*, v. RELIANCE LIFE INSURANCE COMPANY, *Appellant*.[1]

[1]Reported in 275 Pac. 550.

154

*George F. Hannan,* for appellant.

*G. F. Vanderveer (Everett C. Ellis* of counsel,) for respondent.

PARKER, J.—The plaintiff Storwick commenced, in the superior court for King county, four actions against the defendant insurance company, in each of which he sought recovery upon an insurance policy issued to him by that company of benefit installments which he claims are due to him because of disability incurred, against which he is insured by each of the policies. The controlling facts and law being almost wholly common to all four actions, they were, by consent, consolidated for the purpose of trial. The actions so tried by the court, sitting with a jury, resulted in verdicts and judgments awarding to Storwick recovery upon each of the policies. From each of the judgments, the insurance company has appealed to this court, and they are now before us upon the combined records of the actions in the superior court and one set of briefs in this court.

On February 7, 1917, the company issued to Storwick a policy insuring his life in the sum of $1,000, and also insuring him against disability incurred while living, in so far as we need here notice its language, as follows:

"If the Insured has not attained the age of sixty years after one full annual premium has been paid and before a default in the payment of any subsequent premium, this policy will become fully paid up, requiring no further payment of premiums by the Insured, provided evidence, satisfactory to the Company, shall be furnished by the Insured that *he has become totally and permanently disabled for life by bodily injury or disease, and is thereby prevented ·from performing*

*any and every kind of duty pertaining to his occupa-
tion or any other occupation or gainful pursuit.
. . .*

. "During the period of total and permanent disa-
bility, and at any time one year after the premium
anniversary date first following the date of such dis-
ability, the Company will, at the request of the In-
sured and beneficiary or assignee, if any, pay a
monthly income amounting to 1% of the face value
of the policy, if there be no existing indebtedness, or
if there be such indebtedness, 1% of the face value of
the policy less such indebtedness; such payments to
continue until the total amount of payments made
shall equal the face of the policy, less all indebtedness,
if any, at which time the Company's liability under
this contract shall cease. . . .

"If, however, the Insured shall recover so as to be
able to engage in any occupation for wages or profit
during the premium payment period, or before the
full amount of the policy is paid, he shall then be re-
quired to pay all premiums becoming due under this
contract after the date of recovery, and the liability
of the Company will be limited to the face of the policy
less all payments made to the Insured and less all in-
debtedness thereon."

On February 10, 1920, the company issued to Stor-
wick two other policies, each insuring his life in the
sum of $2,000, and each also insuring him against dis-
ability, while living, by language concededly of the
same import, in so far as we need here notice it, as in
the policy of February 7, 1917. On November 14,
1924, the company issued to Storwick an accident
policy insuring his life in the sum of $3,000, and also
insuring him against disability incurred while living,
in so far as we need here notice its language, as fol-
lows:.

"If such injury shall not result in loss of life, but
shall, from the date of the accident, render the insured
*continuously unable to transact each and every part
of his business duties,* the Company will pay for the
period of such disability and such total loss of time;

not to exceed 104 consecutive weeks, an indemnity per week of $25."

"After 104 weeks indemnity payments will continue so long as insured during life shall be *wholly and continuously disabled by such injury from engaging in any occupation or employment for wage or profit.*"

We have italicized the above quoted language of the policies which is of particular concern in our present inquiry. Storwick, at the time of the issuance of the policy of February 7, 1917, had been employed at sea on merchant vessels for a period of eighteen years, and he was then a "second officer," according to his application made part of that policy. At the time of the issuance of the two policies of February 10, 1920, he had continued his seafaring life and was then a "first officer," according to his application made part of those policies. At the time of the issuance of the policy of November 14, 1924, he was not employed at sea, but was then employed by a steamship company as a stevedore foreman, according to his application made part of that policy. He testified that:

"I have followed only two occupations in my life, that is, seaman from the bottom to the top, and then I have occasionally worked as a stevedore foreman."

During the whole of the time since prior to the issuance of the policy of February 7, 1917, the residence of Storwick and his family has been in Seattle. On October 26, 1925, Storwick, being then fifty-two years old, was injured while working as a stevedore foreman in Seattle, in loading lumber on the steamship Hollywood, by a heavy timber falling on his head, fracturing his skull and injuring the tissues of his brain, as it is claimed, so as to totally disable him from performing any gainful occupation or pursuit, within the meaning of the language of the policies above noticed. There has been no default in payment of any premium upon the policies.

The consolidated actions came to trial on January 31, 1928, resulting in the verdicts and judgments being rendered soon thereafter. Storwick was awarded recovery in the sum of $270 upon the policy of February 7, 1917, manifestly upon the theory of $10 per month from the time of his injury until the time of the trial; $540 upon each of the two policies of February 10, 1920, manifestly upon the theory of $20 per month upon each from the time of his injury until the time of the trial; and $325 upon the policy of November 14, 1924, manifestly upon the theory of $25 per week from the time the company had ceased paying installment benefits upon that policy until the time of the trial.

■ The principal contention here made in behalf of the company is that Storwick was not totally disabled, within the meaning of the policies, and that the trial court erred in refusing to so decide as a matter of law in response to appropriate motions made in that behalf by counsel for the company. The argument touching this contention. calls, first, for inquiry as to what is meant by the total disability clauses of these policies. For the present, we proceed with this inquiry upon the theory that the words "any other occupation or gainful pursuit," as used in the policies of February 7, 1917, and February 10, 1920, and the words "any occupation or employment for wage or profit," as used in the policy of November 14, 1924, are unqualified by preceding words of the respective policies, though there does seem to be room for regarding them as so limited and qualified under the doctrine of *ejusdem generis.*

To what extent an insured, under policies such as these, must be disabled in order to be considered as totally disabled, entitling him to the benefits of the insurance, has been a much litigated matter in the courts of this country. Some few courts have seemed

to go to the extreme of holding to the literal meaning of the total disability clauses in such policies. It seems to us, as it apparently has to a majority of the courts of the United States, that such extreme holding to literal construction has not been in keeping with the real intent of the parties to such insurance contracts. Total disability, it seems to us, is largely a relative question for determination. One who has entirely lost his reason and one who has become physically helpless to the extent that all of his physical wants have to be supplied through the efforts of others, would, we assume, be held totally disabled and entitled to the insurance benefits under such policies, even under the doctrine of literal construction. But even as to the latter, it is not impossible that one so physically disabled might be mentally able to direct and advise to the extent of earning some pecuniary compensation therefor. Under such disability clauses, we think the question of total disability should be determined in the light of the capabilities and training of the insured, especially where his capabilities and training are evidenced in the contract of insurance, as here.

It seems to us that one is totally disabled, within the meaning of these policies, when he is so far disabled that he cannot, with any degree of success, within the range of his normal capabilities, earn wages or profit in some occupation or gainful pursuit. In *Foglesong v. Modern Brotherhood of America,* 121 Mo. App. 548, 97 S. W. 240, there was drawn in question the meaning of a total disability clause reading: "Disability of said member which renders him unable to carry on or conduct any vocation or calling." The plaintiff in that case was, at the time of his injury, fifty-seven years of age and had been so afflicted for some three years. He was a farmer. It was shown that he directed work to be done upon his farm and

performed some light labor thereon himself, but was disabled from carrying on, other than partially, the occupation or business of a farmer, and seems to have been equally disabled from carrying on any other gainful occupation or business. It was contended that he was not totally disabled, and certain authorities holding to the literal construction view of such total disability insurance clauses were invoked. Answering this contention, Judge Broaddus, speaking for the court, observed:

"If such is to be the construction placed upon the policy in suit, the defendant's demurrer to the evidence should have been sustained. But we are unwilling to adopt such a doctrine, the effect of which would be, practically, to reduce all such contracts to nullities, and to make them the instruments of extracting dues from policy holders without creating any liability on the part of the insurers.

"Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation—some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoestrings or lead pencils, or follow some similar calling; in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties. In order to carry out the intent of the parties, it is our duty to disregard the broad language used which would have the effect to defeat the purpose of the contract and render it a nullity."

In *Industrial Mutual Indemnity Co. v. Hawkins*, 94 Ark. 417, 127 S. W. 457, 29 L. R. A. (N. S.) 635, there was drawn in question the meaning of a similar un-

qualified total disability clause. Answering the contention that this clause should be taken literally, Judge Frauenthal, speaking for the supreme court of Arkansas, adopting the view of the Missouri court, said:

"Total disability is necessarily a relative matter, and must depend chiefly on the peculiar circumstances of each case. It must depend largely upon the occupation and employment and the capabilities of the person injured. . . . The plaintiff was an uneducated day laborer. He had no ability to do any business of any kind except that of manual work. He could not practice law or medicine or perform the duties of a banker or bookkeeper. He did not have the ability to follow these lines of business; and yet he was not so totally disabled that he could not follow these avocations if he had possessed the ability to do so. It is, in effect, contended by defendant that by the terms of the contract he could theoretically, if not practically, do some kind of business, and therefore he cannot recover. Such a construction of the contract would virtually make it ineffective for any purpose at its very execution. Under such an interpretation, the insured would scarcely, if ever, be entitled to indemnity. But we are of opinion that it was the intention of the parties that the plaintiff should under some circumstances receive indemnity. For that protection he was making stated payments and the defendant received such payments. It was manifestly the intention of the parties that he should receive indemnity when he was so injured that he was wholly and totally disabled and prevented from the prosecution of any business which he was able to do or capable to engage in; and we think that this interpretation of the contract is not inconsistent with the above provision defining the nature of the disability as contemplated by the policy."

In *Monahan v. Supreme Lodge of Columbian Knights*, 88 Minn. 224, 92 N. W. 972, there was drawn in question an unqualified total disability clause. Holding to the liberal construction view of such clauses, Justice Collins, speaking for the court, said:

"The language under consideration cannot be held to mean that a member, in order to have the disability benefits, must be incapacitated to the extent that he has not sufficient physical power and strength to follow any occupation whatsoever. He may be able to do some work or to engage in some occupation, although laboring under great physical and mental disadvantages and suffering. Finally, upon the subject of proper construction we shall not undertake to improve upon the apt language of the learned trial court when denying the motion appealed from, as follows: 'The words "following any occupation" mean something more than the doing of one or more acts pertaining thereto. They involve the idea of continuity, and involve, also, the doing of all those things which are an essential part of the work or business in which a party is engaged.' To construe the language in question as contended for by defendant's counsel would be to give it no effect whatever, for it is difficult to conceive of a case where a man would be so completely disabled as to prevent his engaging in any kind of occupation. It must have a practical and rational construction. The plaintiff was shown to be substantially unable to follow any occupation, because he was not able to do all of the essential acts necessary to be done in the prosecution of an occupation."

Observations and arguments of the same general import in support of the liberal construction view of unqualified total disability clauses are ably set forth in the following decisions: *Grand Lodge Brotherhood of Locomotive Firemen v. Orrell*, 206 Ill. 208, 69 N. E. 68; *Bachman v. Travelers' Ins. Co.*, 78 N. H. 100, 97 Atl. 223; *Jacobs v. Loyal Protective Ins. Co.*, 97 Vt. 516, 124 Atl. 848; *Great Southern Life Ins. Co. v. Johnson*, 294 S. W. (Tex. Civ. App.) 675; *Fidelity & Casualty Co. of New York v. Logan*, 191 Ky. 92, 229 S. W. 104. We quote from and cite the above noticed decisions as being directly in point here, assuming for argument's sake that the total disability clauses of

the policies here in question relate to every possible gainful occupation or pursuit, as though unaccompanied by any qualifying terms, expressly or impliedly limiting total disability to the insured's occupation or business.

The following decisions contain arguments and observations strongly supporting the law as announced in the above noticed decisions, though they deal with total disability clauses referring in terms to total disabilities which the insured may suffer preventing him from carrying on or engaging in his occupation or business, or in terms not expressly or inferentially referring to all possible occupations or businesses in which the insured might profitably engage: *Turner v. Fidelity & Casualty Co. of New York*, 112 Mich. 425, 70 N. W. 898, 38 L. R. A. 529; *Young v. Travelers' Insurance Co.*, 80 Me. 244, 13 Atl. 896; *National Life & Accident Ins. Co. v. O'Brien's Executrix*, 155 Ky. 498, 159 S. W. 1134; *Neill v. Order of United Friends*, 149 N. Y. 430, 44 N. E. 145; *Thayer v. Standard Life & Accident Co.*, 68 N. H. 577, 41 Atl. 182; *Clarke v. Travelers' Ins. Co.*, 94 Vt. 383, 111 Atl. 449; *Hohn v. Interstate Casualty Co.*, 115 Mich. 79, 72 N. W. 1105; *Lobdill v. Laboring Mens' Mutual Aid Association*, 69 Minn. 14, 71 N. W. 696, 65 Am. St. 542, 38 L. R. A. 537; *Metropolitan Casualty Ins. Co. v. Cato*, 113 Miss. 283, 74 South. 114; *Booth v. United States Fidelity & Guaranty Co.*, 130 (N. J.) Atl. 131; *Commonwealth Bonding & Casualty Ins. Co. v. Bryant*, 113 Tex. 21, 240 S. W. 893; *Gross v. Commercial Casualty Ins. Co. of Newark*, 90 N. J. Law 594, 101 Atl. 169.

Now, adopting, as we do, the liberal view of the meaning of the total disability clauses of these policies, in harmony with the above noticed decisions, though conceding that there are some holding to the contrary, we inquire, Was the evidence of Stor-

wick's disability such as to warrant the jury concluding that he was totally disabled within the meaning of these policies? There was abundant evidence of his skull having been fractured and his brain being injured. As to the extent of his disability so caused, we quote some of the testimony given upon the trial.

Storwick testified in part as follows:

"Q. I want you to tell the jury in your own way what has been the effect of the injury . . . A. Well, I was knocked out for quite a while; and afterwards when I came to, there was someone pouring water on me, as I remember it, some one was pouring water on me; and after I came to, I laid around there for a little while, and then they took me ashore to the company doctor. I was bleeding; the blood was all over, and I had a cut on my head; when it fell against me it gashed my head open. . . . Q. Have you worked any since your injury? A. No, sir. Q. Have you been able to work since your injury? A. No, sir. Q. Have you been able to do any kind of work at all? A. No. Q. Now, you spoke of having some trouble ever since with a pain in your head. Has that disappeared now? A. No. Q. How is it? Just tell the jury. A. Well, there is a pain under the skin, you know, when you get the skin torn out, there is a terrible pain in the scalp; and it was all crushed up there; and that lasted three or four weeks, and maybe longer, and then that disappeared; and then it feels the same thing in the bone, inside, it seems like electricity running through it, and it gives me a shock once in a while, and I fall right over, just the same as if someone hit me in the head, sometimes, just like you took a sharp file and dug it in you know, and it eases up for a minute; and it causes me dizziness; I cannot hold myself. If I don't get in a chair, I fall over. I have got to steady myself, and brace myself up again. Q. How frequently do you have such attacks as that? A. Oh, I have them frequently. I could say, continuously, practically. Q. Can you tell when they come? A. I cannot tell. They come practically all the time. I have never been relieved of the pain, practically,

from the time I was hurt. Sometimes it eases up a little bit, and feels like it is tickling, without any pain; and they come on again, like if you pour a bucket of hot water on me; and it just paralyzes me; it throws me off my balance altogether. Q. Do you know what effect any exertion has upon you, like walking, or anything of that sort? A. Yes; it has a terrible effect. Q. Just tell the jury what effect exercise has on you. A. If I try to walk quite a bit or when I get too warm, that is when I get it more than anything else, when I am down town, I am very careful about going through heavy traffic in an intersection like, here, or going into traffic, I feel like I don't know whether I am going or coming. I can't tell. I don't trust myself."

Dr. Smith testified in part as follows:

"Q. Did you ever have Mr. Storwick as your patient, after he received an injury to his head? A. Yes. Q. For how long a time was he under your observation then? A. Well, he was under my observation from the time after his injury up until the present time, practically. He has been reporting to me off and on ever since that time. . . . Q. What was the nature of the injury which he sustained in the accident? A. He had a severe laceration of the scalp, and an injured thumb, and a concussion of the brain, and a fractured skull. Q. What has been the effect of the fracture of the skull, and the brain concussion? A. Well, he has had persistent headaches since the injury; and he has had attacks of vertigo. Q. By that, you mean dizziness? A. Dizziness, and falling, he has had a tendency to fall. Q. Did he ever have any of these things before he received this injury? A. Not that I know of. Never when I had seen him at least. Q. Do you notice any change in his personality? A. Yes. Within the last year, or the last fourteen months, there has been a marked change in his mentality. Q. Will you explain to the jury what it is? A. Well, he is quite excitable; does not take anything to get him riled up and excited, when he goes off the handle. When he was in the office the other day, I was discussing his symptoms, and so forth, with

him; and he got quite angry at me; and he threatened to tear the office up; and he banged his fist on the desk, and talked loud enough so you could hear him clear out in the reception room. Prior to that, he was very quiet. Q. In your opinion, is he able to assume charge of a ship as master, and take the responsibility of a ship, cargo, passengers and crew? A. In my personal opinion, no. . . . Q. You know more or less of the line of work of stevedoring? A. Yes. Q. Knowledge which you have gained through treating many stevedores for the stevedoring companies? A. Yes. Q. You know then what the work, in a general way, what the work of a stevedore foreman or a hatch tender is, on board ship? A. Yes. Q. In your opinion, is Mr. Storwick capable and able to assume the responsibilities of such duties? A. I would say No. . . . Q. Is he able to do manual labor involving physical efforts? A. I do not think he is able to do or perform manual labor."

Dr. Loe testified in part as follows:

"Q. Now, Mr. Storwick came to you as a patient suffering from some headaches? Did he? A. Yes. Q. Do you recall when it was, Dr. Loe? A. It was in October, 1925. Q. What sort of an examination did you make of him at that time? A. A general physical examination. Q. What did you observe about his condition? A. I observed some scars on his head, from his injury; and I found a slight depression in the skull; he was in an irritable condition. And I had some X-rays taken of his head and body. Q. Did you see the X-ray films themselves? A. No; I had a report on them. Q. What did they disclose? A. It was reported a fracture of the skull. Q. What then were the conditions that you observed yourself, which were indicative of a skull fracture? A. Well, he had symptoms of irritability and exhausted mentality that goes with those cases. . . . Q. Had you ever known Mr. Storwick previous to October, 1925? A. Yes, I had been the family physician for a number of years. Q. Did you detect yourself the change in his mental condition and his nervous condition? A. Yes. Q.

Just explain to the jury what you saw. A. Well, he was very nervous and irritable; and he complained of being dizzy, and of pressure on top of the head; and he also complained of pain on the top of the head. Q. Had he been nervous and irritable before? A. No. Q. What do you think of his ability to take care of, or charge of a ship as master, and assume the responsibility of the crew of the ship, and the cargo, passengers, and general operation of the ship at the present time? A. I do not think he is mentally stable enough to do that kind of work. Q. What do you think of his ability to take care of a stevedore gang as hatch tender, or boss or direct them during the operations of loading and unloading ships, with proper regard for the protection and the safety of the men? A. I do not think he should have any position where he would have the lives of other workmen under his care. Q. What about his ability to direct other men who may be working in such capacity? How in your, opinion, if at all, is his mental stability affected by that? A. I do not think he is mentally stable enough to do that kind of work. Q. What have you to say about his ability to do hard manual labor? A. Well, I do not think he is physically fit for hard manual labor. . . . Q. Well, do you believe that he is suffering from brain pressure? A. I believe he is suffering from pressure due to the fracture. Q. And is vertigo common or uncommon in such cases? A. It is not uncommon.''

Dr. Swift testified in part as follows:

''Q. You know Mr. Storwick? A. Yes. Q. He was sent to you by Dr. Loe? A. Yes. Q. Had you ever known him prior to that time? A. No. Q. What examination did you make, or cause to be made, of him? A. At the time he came to me, he gave a history of having been struck on the top of the head, and sustaining a fractured skull. Before examining him from the standpoint of injury to the skull, or injury to the brain, I had an X-ray taken, which showed that he had a depressed skull fracture in the top of his skull. . . . Q. How recently have you examined him? A.

About two weeks ago. Q. How many times since he first came to you have you seen him? A. I have examined him, I think, in all, seven times. Q. Spread more or less over that entire period? A. From January, 1926. I saw him several times in that period. I don't know how many, but in this matter, about every three months I have had occasion to examine him. Q. Have you taken any special pains to observe his conduct with reference to his mental stability? A. Yes. Q. His nervousness and irritability?. A. Yes. Q. What have you to say about that? A. When he first came in, he seemed to be suffering more or less from headaches; and he improved for a while; then the mental condition began to predominate. All of his physical signs and symptoms had disappeared, practically, as far as I could tell, but he developed a marked emotional instability. He used to have control of himself on all occasions; but he has had three or more brainstorms in my office. . . . Q. Is that change in mentality indicative of emotional instability? A. That is one of the changes that we look for in anyone who suffers a severe concussion of the brain. Q. What have you to say about the permanency of that change? A. I think it will gradually get more and more pronounced. Q. You think he will get worse instead of better? A. The history of these cases is that in from three to five years, he will become more or less greatly permanently unstable. Q. What is your opinion about his condition as to his ability to take care of a ship as master? A. I do not think he can. Q. What about his ability, in your judgment, to take charge of a stevedoring crew which is engaged in dangerous operations? A. I do not think this man is capable of doing any work that will require him to pass judgment on anything, no matter how small it is; no matter whether it is running a ship, or loading vessels, or anything that requires mental processes operating, he cannot do that; he will go into a brain storm and break. Q. What about his ability to perform hard manual labor? A. I don't think he can do it. Q. What would be the effect of that upon him? A. He will deteriorate more rapidly.''

168

Mrs. Storwick, the wife of Storwick, testified in part as follows:

"Q. How long have you been married? A. Almost sixteen years. . . . Q. Now, Mrs. Storwick, what about Ed's disposition before he was hurt? A. Well, it is not like he would be the same man. Q. Will you tell the jury what you know about it? A. Before the accident, he used to be so easy, you know, and took everything as it came along, and never flew up; but now, he just flies off the handle at anything that happens around the house, . . . Q. Has he done any work since he was hurt? A. No."

There is other evidence in a considerable measure corroborating the above quoted testimony, and there is also other evidence in a considerable measure of a somewhat pronounced contradictory nature, which tends to show that Storwick could profitably follow some light occupation or business. We are of the opinion that we would not be at all warranted in disturbing the verdicts and judgments upon the ground that they are not supported by substantial evidence. In order to disturb the verdicts and judgments, it seems plain to us that we would have to weigh and consider the credibility of the testimony.

■ Contention is made that the verdicts are, in any event, excessive, in awarding recovery upon the policy of February 7, 1917, and the two policies of February 10, 1920. The argument is that the awards of installments for several of the earlier months of disability were erroneous. It will be remembered that the policy of February 7, 1917, above quoted from, provides that:

"During the period of total and permanent disability and at any time one year after the premium anniversary date first following the date of such disability,"

the company will pay the monthly benefit. This language does seem to furnish some room for arguing that Storwick would not be entitled to the payment of the monthly installments for the months preceding one year after the premium anniversary following the date of disability, but the preceding words are "during the period of total and permanent disability." We think the most that can be successfully claimed is that Storwick would not be entitled to receive the payments until one year after the premium anniversary following the date of disability. This, we think, does not successfully argue that he would not then be entitled to the back installments during the whole period of his total disability. This view, we think, is equally applicable to the two policies of February 10, 1920, though by the terms of those policies the time for making the payments by the company to Storwick begins six months after the receipt of proof of the disability. We conclude that the verdicts and judgments are not excessive.

Several other claims of error are made in behalf of the company which relate to rulings of the court upon the admission and rejection of testimony. These claims of error are made looking to a new trial in the event we should be of the opinion that the trial court did not err in allowing the case to go to the jury for final determination upon the merits. We have carefully examined each of these claims of error and are well satisfied that they are not well founded. We do not feel that they are of such importance as to call for discussion in this opinion.

Finally, contention is made, and somewhat briefly argued, claiming error in the trial court's refusal to give certain requested instructions to the jury. This contention, as we understand counsel, is but a reassertion of his contention that the court should have

adopted and given to the jury instructions in harmony with the literal meaning of the total disability clauses of the policies. We think what we have already said sufficiently disposes of this contention.

The verdicts and judgments are affirmed.

MITCHELL, C. J., HOLCOMB, FULLERTON, MAIN, FRENCH, and MILLARD, JJ., concur.

TOLMAN, J. (dissenting)—I am quite in accord with the majority in adopting the so-called liberal rule, and I agree that, under that rule, the words of the policies as to ability to follow any occupation or employment for wages or profit are not to be taken literally. I am not out of accord with the majority holding that,

"Under such disability clauses, we think the question of total disability should be determined in the light of the capabilities and training of the insured, especially where his capabilities and training are evidenced in the contract of insurance, as here. It seems to us that one is totally disabled within the meaning of these policies when he is so far disabled that he cannot, with any degree of success, within the range of his normal capabilities, earn wages or profit in some occupation or gainful pursuit",

but I cannot read the instructions of the trial court as submitting such a rule to the jury. On this subject the following instruction was given:

"All of the policies provide, in substantially the same language, that if the plaintiff shall suffer an accident and shall thereby be disabled from performing any and every kind of duty pertaining to his occupation, or any other occupation or gainful pursuit, then the defendant would pay the plaintiff certain specific sums of money about which I shall instruct you more particularly hereafter. I now instruct you that the provision in the policies to which I have just referred, namely, that if the assured be prevented from performing any and every kind of duty pertaining to his occupation or any other occupation or gainful pursuit,

means in law that he must be disabled from performing the duties of his occupation or occupations in which he was engaged at and prior to the time the policies were written, or occupations of like general character.

"It is undisputed that, at the time these policies were issued, the plaintiff was a master mariner and was employed as either master or mate on steamships or as a stevedore foreman or hatch tender in stevedoring operations. The duties of these occupations have been described to you by the different witnesses. If you find that the plaintiff suffered an accident which has disabled him continuously from performing the duties of these occupations or other occupations of like character and dignity, then he is entitled to recover the payments provided for in the several policies during the period of such disability. The courts do not construe this provision of the policy as requiring the assured to engage in menial occupations entirely unlike the occupation in which he was formerly employed. The law regards the insured as totally disabled within the meaning of the provision of this policy when he is disabled from performing work of like general character and dignity with that in which he had formerly been engaged."

The vice of this instruction to my mind lies in its statements as to "occupations of like general character," "like character and dignity," "menial occupations unlike the occupation in which he was formerly employed," and the very pronounced complexion which such expressions cast upon the whole instruction.

These contracts looked only to financial indemnity for financial loss, and did not undertake to insure respondent's pride, his prejudice or his preferences. Moreover, we have no classes before the law, and he who labors with his hands is, in law, equal in dignity to one who, by inheritance, or by mental training or skill, enjoys the fruits of the labor of others. Yet we well know that there are many who look down on labor

or on menial service, and to so instruct was to invite the jury to indulge in passion and prejudice.

He who labors with his hands is not only equal before the law with the man of trained mind, but in these days the laborer often earns more in direct financial returns than does the college graduate. Therefore the capacity to earn was the only element which should have been submitted.

In my opinion, the judgment should be reversed because of the giving of the instruction quoted.

BEALS, J. (dissenting)—In my opinion, the instruction quoted in the dissent of Judge Tolman is not a correct exposition of the law applicable to the question attempted to be covered thereby, and the giving of this instruction constituted reversible error requiring the granting of a new trial.

I do not, however, believe that, in such a case as this, the capacity to earn is the *only* element to be considered. There was not written into any of the policies a provision to the effect that, in case the insured suffered injury, he would submit himself to the insurer for such training as would fit him to earn money along some new line of endeavor, nor does any of the policies provide that the insured will endeavor to qualify himself as a money earner in some field other than that in which he was engaged at the time of the issuance of the policy or was engaged in at or prior to the time of his injury. In other words, the policies do not contemplate or provide for the rehabilitation of the insured in case he suffers injury. The insurer wrote the policies now before us for valuable considerations, and it is, of course, the law that such policies must be construed against the insurer and with reasonable liberality in favor of 'the insured. It must be held, as stated by the majority, to be the intent of the policies that the insured is totally disabled when he

has suffered injuries which prevent him from earning reasonably substantial wages or profit (and in connection with what is reasonably substantial, there should be considered the earnings of the insured at the time the policy was written) at some occupation or gainful pursuit of the same general nature or character as the occupation in which the insured was engaged at the time the contract of insurance was entered into, or in which he was engaged at the time of his injury. It seems to me that a professional man should be held to be totally disabled in case he should be, by some injury, totally incapacitated from practicing his, or any profession, even though he might be able to perform some sort of manual labor. Conversely, a manual laborer protected by such an insurance policy should be held to be totally disabled if incapacitated from working with his hands, even though his brain be uninjured and it might be supposed that, by successfully pursuing some course of study, he could qualify himself for following a profession. This is true, not because of any fancied difference in "dignity" between the different occupations, but because of the situation at the time of the issuance of the policy in view of which the policy was written.

Insurance policies such as are the basis of this action are not altogether admirable contracts. They are "long-shot" contracts in which, for a comparatively small premium, the insurer agrees to subject himself to a very considerable liability in the happening of certain events. The accrual of liability under such a contract, to a certain extent at least, places a premium, once the insured is receiving the benefit of the policy, upon his failing to exert his utmost endeavors to benefit himself and make the best of a bad situation. At least one of the policies provides that, if the assured, after payments are made to him upon the basis of his

total disability, engages in any gainful occupation, the payments cease. Such a provision as this tends to induce the assured to remain idle and thereby continue to enjoy the benefits of the policy. It would seem that a much more logical and reasonable policy would assure to the insured a certain income, and also provide that the insured would do his best to place himself upon an earning basis. Such a policy would not partake of the nature of a wagering policy to the same extent as those now before us, and it would seem that the cost of such a policy to persons desiring to procure the same would be less than an insurer must charge for such policies as were issued to the respondent. Such policies as these appear to place a premium upon unjust claims on the part of malingerers who are willing to take an unfair advantage of their misfortunes. It is, of course, true that the policy of insuring against future possible disaster is to be commended, but the commendable principle is protective and not possible profit.

It seems to me that, in using the words "dignity" and "menial," the trial court gave to the jury false standards by which to determine the respective claims of the parties to this action. Of course it could not be reasonably urged that an insured, under such policies as are now before us, could be required to attempt to earn money peddling lead pencils on the street corner, but, on the other hand, if able to perform work of like general nature and character, without regard to any supposed dignity or lack of dignity, to that in which he was previously engaged, he should not be held to be totally disabled within the terms of any such policy.

Because of error in the instruction quoted in the dissenting opinion of Judge Tolman, the judgment appealed from should be reversed and a new trial ordered.