GEORGE H. KURTH, Appellee, v. CONTINENTAL LIFE INSURANCE COMPANY, Appellant.

No. 40434.

JANUARY 13, 1931.

*Curlee, Nortoni & Teasdale* and *Cook & Balluff,* for appellant.

*Bush & Bush,* for appellee.

DE GRAFF, J.—On account of the various questions presented

in this action, it is logical to answer same in natural sequence, together with the facts respectively pertaining thereto.

I.    The action is based on a life insurance policy, in which are found special clauses, known as "double indemnity" and "total and permanent disability" benefits. The "double indemnity" insurance provides that, if the death of the insured results directly from accidental causes within 60 days from the date of the injury, the amount payable therefor shall be double the face of the policy. The "total and permanent disability" insurance is provided as follows:

"After one full annual premium has been paid, and before default in the payment of any subsequent premium, and before the insured shall have reached the age of sixty years, if the insured shall furnish satisfactory proof that he has been wholly disabled by bodily injury or disease for a period of not less than sixty days and that such disability is presumably permanent and that he will be wholly and continuously prevented thereby from pursuing any gainful occupation the company will grant the following benefits: * * *"

In the instant case, this court is called upon to deal solely with the "total and permanent disability" insurance provided for in the contract. The benefits to be granted under this particular insurance (which may be read as a continuation to the foregoing quotation from the contract) are:

"(1) Waiver of premiums. The company, by endorsement on the policy, will agree to pay for the insured the premiums which shall thereafter become payable during the continuance of such disability, beginning with the first anniversary of the policy next following the acceptance of such proof. The premiums so paid shall not be a lien on this policy and the values set forth in this policy shall increase in the same manner as if the premiums were paid by the insured, and

"(2) Installment Payments. Six months from the date of such endorsement, on receipt of proof that he is still and has been continuously disabled as defined above, the company will pay to the insured one tenth of the face of the policy, and a like amount annually thereafter during the life and continued total disability of the insured, or until the maturity of the policy as an endow-

ment. If there is any indebtedness on the policy the interest thereon shall be deducted from each income payment. Upon the death of the insured, the policy shall be payable in accordance with its terms.''

It is seen that, upon the happening of the contingency insured against,—that is, the suffering of total and permanent disability, as defined,—the company, upon satisfactory proof thereof, agrees to waive the future premiums which may thereafter become due on the policy and during the continuance of such disability, and to provide for such payments by indorsing the agreement on the contract itself; and further, six months after the date of such indorsement, upon proof of the continuation of such disability, to pay one tenth of the face of the policy, or, in this instance, $500, to the insured, and annually thereafter to pay a like sum during the life and continued disability of the insured. There appears to be no ambiguity in these provisions, and they should cause no particular difficulty in construing them, except as respects the starting point. As said before, the contingency insured against is: that the insured has been wholly disabled for a period of not less than 60 days, and that such disability so suffered is *presumably* permanent, and that he will be wholly and continuously prevented thereby from pursuing any gainful occupation. This may be clarified by analysis in this manner: If the insured has been wholly disabled (a) for a period of not less than 60 days, and (b) such disability as has existed for not less than 60 days is presumably permanent, and (c) the insured will be wholly and continuously prevented by the disability that has existed for a period of not less than 60 days, which disability is presumably permanent, from pursuing any gainful occupation. It would thus appear that these three separate factors were combined, and that upon the combination only are the benefits to accrue.

If the construction sought to be placed on the policy by the defendant Insurance Company should prevail, the waiver of premiums would then mean nothing; secondly, the installment payment provisions would mean nothing, as they, if any there be due, are to be paid to the insured himself. The fact is that the use of the word ''presumably'' in connection with ''permanent'' is sufficient to destroy the idea that it was intended that the absolute certainty of the permanency and the absolute certainty

of the continuance of the disability should prevail. The word "presumably" is a comparative adverb, as used in this instance, and by its very nature precluded the idea of an absolute, lasting, or fixed condition. Its meaning is: fit to be assumed as true in advance of conclusive evidence; credibly deduced; fair to suppose; by reasonable supposition or inference; what appears to be entitled to belief without direct evidence. Webster's New International Dictionary. By the employment of this word "presumably," it is clear that there might be some question, at present or in the future, concerning the permanency and continuancy of the described disability. It next follows that the phrase "and that he will be wholly and continuously prevented thereby" must be construed as not implying absolute certainty, but as a reasonable and fair presumption that "he will be wholly and continuously prevented thereby from pursuing any gainful occupation." The words, "permanently" and "continuously," standing alone, would imply that the disability was a lasting and absolutely fixed condition; but when these words are taken in connection with the language used in other provisions of the contract, the only fair construction to be placed on such words is, not that the disability which has existed during 60 days must exist forever, but that such disability has existed for a period of not less than 60 days and by a fair presumption will continue for a future period. *Penn Mut. Life Ins. Co. v. Milton*, 160 Ga. 168 (127 S. E. 140). To sustain this point, we quote another clause of the contract, as follows:

"After accepting proofs of disability under this policy the company shall have the right at any time thereafter, but not more frequently than once a year, to require proof of the continuance of such disability; and if the insured shall fail to furnish such proof, *or if it appears that the insured has so far recovered as to be able to engage in any gainful occupation*, the company's obligation to pay the premium and installments shall cease." (Writer's italics.)

By the insertion of the foregoing clause in the contract, it is obvious that the disability by which the benefits may accrue and become obligations of the company is not absolutely expected to be absolutely permanent and absolutely continuous and to absolutely prevent the insured during his after lifetime from en-

gaging in any gainful occupation; because this insertion was intended to govern when and if such presumably permanent disability might be removed by some means or other, and the company desired what benefits it might have by reason of such removal. It must, therefore, be held, as a matter of law, that the insured, under this contract, was required to furnish proofs only of the fact that he had been wholly disabled by bodily injury or disease for a period of not less than 60 days, and that such disability is presumably permanent, and that he will be presumably wholly and continuously prevented thereby from pursuing any gainful occupation.

The next question involves the phrase, "Prevented thereby from pursuing any gainful occupation." In *Hurley v. Bankers Life Co.*, 198 Iowa 1129, this court delved deeply into this question, and said:

"Many cases have been before the courts, involving construction of contracts of this character, which, however, are not always identical in phraseology. The cases fall quite readily into  two general classes: Those wherein the policy provides for indemnity if the insured is disabled from transacting the duties pertaining to the occupation in which he is then engaged; and those wherein the policy provides for indemnity if the insured is disabled from performing any work or following any occupation."

In that opinion there are found various phrases governing the subject, that were considered in arriving at the final decision. We now present several more phrases, for the purpose of showing how radically different some of them are, and also that each phrase must be separately analyzed, and all other conditions of the contract bearing upon the subject be considered, before a final conclusion may be drawn therefrom.

"'* * * total disability of said member, which renders him unable to carry on or conduct any vocation or calling * * *.'" *Collopy v. Modern Brotherhood of America*, 133 Minn. 409 (158 N. W. 625).

"'* * * if the insured shall become totally disabled for life, so as to prevent his following his own or any other avocation

\* \* \*.'' *Starling v. Supreme Council Royal Templars,* 108 Mich. 440 (66 N. W. 340).

'' 'If the said insured shall become totally and permanently disabled \* \* \* the total and permanent disability \* \* \* may be due either to bodily injuries or disease \* \* \* and must be such as to prevent the insured from engaging in any \* \* \* occupation.' '' *Brown v. Missouri State Life Ins. Co.,* 136 S. C. 90 (134 S. E. 224).

'' 'If \* \* \* he has become wholly disabled \* \* \* so that he is and thereby will be permanently and continuously unable to engage in any occupation whatever for remuneration or profit \* \* \*.' '' *Penn Mut. Life Ins. Co. v. Milton,* 160 Ga. 168 (127 S. E. 140).

''\* \* \* he 'has become physically disabled and wholly, continuously, and permanently incapacitated from carrying on any gainful occupation.' '' *Taylor v. Southern States Life Ins. Co.,* 106 S. C. 356 (91 S. E. 326).

'' 'If \* \* \* he has become totally and permanently disabled for life \* \* \* and is thereby prevented from performing any and every kind of duty pertaining to his occupation or any other occupation or gainful pursuit.' '' *Storwick v. Reliance Life Ins. Co.,* 151 Wash. 153 (275 Pac. 550).

While it may be said that all of the phrases quoted fall within the same class as did the phrases found in the *Hurley* case, may it be said that there is no difference in the meaning of these phrases, provided that there was nothing in other clauses which modified them? It will be noticed particularly in the *Hurley* case that the time element is not a factor,—that is, the continuance of the disability in the future. To become entitled to the waiver of premiums in that case, the insured must perforce become totally, permanently, and *incurably* disabled, and, by the very language, precluded from any possibility of a recovery in any degree. In some of these cases, it becomes necessary to not only consider the extent or degree of disability, but also the *time* during which such disability shall continue. In *Collopy v. Modern Brotherhood of America,* 133 Minn. 409 (158 N. W. 625), the court did not have to consider time as an element; while in *Starling v. Supreme Council Royal Templars,* 108 Mich. 440 (66 N. W. 340), and also in *Storwick v. Reliance Life Ins. Co.,* 151 Wash. 153 (275 Pac. 550), the court had to deal with the after

lifetime of the insured. In the case at bar, this court is not confronted with the time element, except as it applies to the period for which the claim is being made; and we must hold that the disability suffered by the appellee is affected only by the time between the starting or commencement of the disability and the date the decree was rendered in his favor by the lower court.

The next question to be determined is whether or not the appellee has been wholly disabled for a period of not less than 60 days, and whether or not such disability suffered for that period was presumably permanent at the time he furnished proofs, and has been total and continuous, and thereby has prevented him from engaging in any gainful occupation. In view of the express provisions of the contract, it cannot be said that the disability of the insured, to entitle him to the benefits agreed upon, shall be decided by a literal construction of the description of disability as contained in the insuring clause,—to wit, such presumably permanent disability that he will be wholly and continuously prevented from pursuing any gainful occupation; for the contract tends to refute it. The following clause is quoted from the policy:

"It is agreed that independent of all other causes of total and permanent disability the entire and irrecoverable loss of the sight of both eyes, or severance of both hands at or above the wrists, or of both feet at or above the ankles, or of one entire hand and one entire foot will be considered as total and permanent disability within the meaning of this provision."

It is common knowledge that in none of these stated causes of disability would the unfortunate victim be wholly and continuously prevented thereby from pursuing any gainful occupation. Persons so afflicted are seen on frequent occasions, engaged in various employments whereby they earn a livelihood, without resorting to the near-beggary vocation of selling papers, pencils, and shoe strings in public places. It is apparent by this clause, inserted upon the volition of the company, and not at the request of the appellee, that it was never intended that the insured be rendered absolutely helpless and continue to be absolutely helpless before becoming entitled to the benefits promised. If it were otherwise, then the appellee must suffer also a destruction of his mental faculties, as well as his physical functions.

II.   This is an action in equity triable *de novo* here, and "in this court the facts as well as the law of the case are again reviewed and re-adjudicated." *Pierce v. Wilson*, 2 Iowa (Clarke) 20, 26.   This is fundamental.   It is said in the early case of *Austin & Spicer v. Carpenter*, 2 G. Greene 131:

"All appeals in chancery must be tried *de novo*, the same as if this court had original jurisdiction, regardless of the decision of the court below, except so far as necessary to a correct understanding of the record and the matters at issue."

The instant plaintiff alleged that, on March 8, 1928, he sustained an accidental injury, by falling from a runway in a lumber shed, a distance of seven or eight feet, alighting on his back on a loose pile of 2x4 lumber, which fall rendered him unconscious for a period of time, and caused various injuries to his back, spinal column, head, neck, cranium, and other parts of his body, whereby he was immediately and wholly disabled, not only for a period of 60 days following, but that such total disability continued, and would continue for a long time in the future, and that such disability is permanent, and by reason thereof he has been, is, and will continue to be wholly and continuously prevented from pursuing any gainful occupation.

He further alleges that, on or about the 7th and 18th of May, 1928, he gave the defendant company written notice of his injuries and disability, and requested blanks for furnishing proofs thereof, and that, on or about May 25, 1928, he sent the defendants by registered mail duly executed proofs of injury and disability.   He further alleged that, on July 3, 1928, the defendant notified him by letter that his claim had been rejected. He further alleged that the proofs of injury and disability furnished by him to the defendant were reasonably sufficient to satisfy a reasonable person, but that, without good cause, the defendant company arbitrarily rejected his claim, and refused to carry out the terms of the insurance policy, which had been originally issued to him by the First National Life Insurance Company, and which had been reinsured and assumed by the defendant company.   It is further alleged that, on or about February 18, 1929, he furnished the defendant company with written proofs that he was still and had been continuously disabled, as defined in said policy, and that, on August 1, 1928, in

order to prevent a lapse of said policy, he paid to the defendant company, under protest, the sum of $188.95, which sum had been retained by the defendant, notwithstanding that its return had been demanded. It is further alleged that plaintiff has no remedy at law.

The prayer of plaintiff is that the defendant company be required to specifically perform the requirements of his said policy, and to indorse thereon an agreement to pay all premiums thereon falling due after June 17, 1928, and to pay plaintiff the sum of $500, with interest from December 17, 1928, and to pay plaintiff the further sum of $500 on December 17th of each succeeding year as long as plaintiff's total disability continues, and to repay to plaintiff the sum of $188.95 with interest from August 1, 1928; and for such other relief as may seem just and equitable.

The defendant company in answer admits the issuance of the insurance policy and the assumption of liability thereon by reinsurance, the receipt of said notice and proofs of injury, but denies that said proofs were or are satisfactory or sufficient to show the total disability of plaintiff, and further denies that the plaintiff was wholly and continuously disabled for a period of more than 60 days, and that such disability was presumably permanent, and that plaintiff would be wholly and continuously prevented by such disability from pursuing any gainful occupation. Defendant further admits that it notified plaintiff that his claim was rejected, on or about July 3, 1928, and denies that the premium of $188.95 should be returned, and that plaintiff is entitled to the sum of $500 or to any part thereof or to any future payments of $500.

The plaintiff amended his petition by adding thereto the provisions of Section 1445 of Article 9 of the Revised Code of 1919 of the state of South Dakota, relating to the furnishing of proofs of loss under insurance policies, and showing further that the application for the policy issued to him provided, *inter alia*, that the contract so applied for and the application should be construed according to the laws of South Dakota, it being understood and agreed that the place of contract is the home office of the company at Pierre, South Dakota.

The defendant answered the amendment by denying that the provisions of said section have any application to the issues in

the case, and avers that said section relates to preliminary proofs of loss, and not to proofs in an action upon said policy.

Upon the trial of this cause, it was shown that no decision of the Supreme Court of South Dakota construing the said section of the South Dakota Code could be found. The trial court herein rendered its decision, giving plaintiff decree and judgment.

The evidence in this case consists of various exhibits and the oral testimony of eight witnesses, six for the plaintiff and two for the defendant. Of the six witnesses for the plaintiff, four were members of "the healing profession." The only two witnesses offered by the defendant were also of that calling.

This court is confronted with the duty of weighing the testimony of six members of "the healing profession," three for the plaintiff being of one school of therapy, two for the defendant being of another school, and one for the plaintiff being a member of both schools. It may be said incidentally that there appears to be some difference in the theories and practices of the schools; but we are not called upon to determine the merits of either school, both being recognized by the statutes of Iowa as proper in their separate spheres of activity, and both being patronized by the suffering public as relievers of physical ailments. We must, therefore, divest these witnesses of their school badges, and deal solely with their testimony as it was given as witnesses before the trial court. The plaintiff offered by his own testimony the only evidence of the occurrence of the accidental fall on March 8, 1928. His evidence is in no way rebutted. He testified that he was a well man prior to the accidental fall, weighed about 220 pounds, was five feet eight inches tall, was manager of a lumber yard at Lenox, Iowa, and at the time of the accident, was engaged in the lumber yard business, and had been for several years. He testified that he fell backwards from the runway in a lumber shed, a distance of seven or eight feet, and upon recovering consciousness, found himself lying on his back on a loose pile of 2x4's; that his arms were numb, legs were cold, and that he was apparently freezing, it being a raw, cold day; that he tried to move and get up, but he could not move his legs. He stated that he was taken home and carried into his house, undressed, and placed in bed; that he could not undress himself; that the pain in his back was almost unbearable; that his head ached severely; and that his eyes pained him. Dr. W. H. Kash, of Lenox, was called, made

an examination, and expressed the opinion that there were no bones broken. On the day following the accident, Dr. E. R. Pennybaker was called. Plaintiff remained in bed until April 9th, on which date he sat in a chair. From the date of the injury, he remained under the care and treatment of his doctors, until the date of trial. The plaintiff was taken to Red Oak, Iowa, for the purpose of having an X-ray taken of his spine, which picture was carefully studied. On April 25th, plaintiff stated that his right leg "came back;" that he could move it. About May 1, 1928, plaintiff was able to hobble around on crutches, but he had no use of his left leg. On May 17, 1928, plaintiff left Lenox and went to Davenport, for the purpose of being examined to ascertain if the proper adjustments of his spinal column had been made. X-ray photographs were again taken. Plaintiff testified that he was unable to carry on any occupation; that his left leg is useless; that he suffers constantly from headaches; that he has pains in his lumbar and other parts of his body; that his right leg is not normal; that he had made an effort to keep up his strength by exercising; that he goes about on crutches; that his greatest trouble is with his left leg; that he has no control over it, and is forced to drag his left foot, having no knee action; that, during cold weather, both of his legs are of little use; that he has continuous ringing in his head, causing severe headaches.

The wife of the plaintiff Kurth testified as to her husband's physical condition during the days immediately following his injury and subsequently thereto. Her testimony corroborated the testimony of the plaintiff as to objective symptoms. She was not cross-examined.

The opinions expressed by the doctors for the plaintiff and the doctors for the defendant, respectively, as to the character of the disability are at variance. We will not encumber this opinion with the testimony of a technical nature, as shown by the record. There is no serious dispute that the conditions found in plaintiff's case are such as could be caused by a fall, as testified to by plaintiff. The evidence shows that plaintiff was injured at the time in question. At this time it may be stated that the doctors called by the defendant did not know the plaintiff, had not treated him, and their only examination of plaintiff was on the day before the trial of this cause. In brief, one of the defendant's doctors testified that he could find no impairment in the plaintiff, and

that there was no evidence that the plaintiff was ever paralyzed in either leg. This doctor did find a difference of three fourths of an inch in the length of plaintiff's legs, and a difference of three-eighths of an inch in the circumference of the left leg, but stated that such differences may be normal, as no two legs are the same length. He expressed his opinion, based on his single examination of plaintiff, that the plaintiff could pursue any gainful occupation. This doctor was of the opinion that plaintiff is neurasthenic, and that all the troubles of the plaintiff are imaginary, and that plaintiff had a motive back of it all. He stated, however, that the first time he ever saw plaintiff was in February, 1929, and admitted that he would be in a better position to judge of the effects of the fall if he had been able to see and examine plaintiff immediately or soon after the accident. He further stated that the plaintiff had an eye and finger tremor, and that he found plenty of symptoms of neurasthenia in plaintiff, and that they persisted.

A study of this record indicates that the doctor had reduced the art of diagnosis and prognosis to an exact science, and that there could be no mistake as to the result of his examination of plaintiff.

The second doctor offered by the defendant testified that he examined the plaintiff at the office of the other doctor offered by the defendant, and on the day before the trial. He testified as to the result of the examination, and that he found proper reflexes; that plaintiff showed symptoms of neurasthenia, but no physical impairment or defect which would cause neurasthenia. He further stated that atrophy of the left leg may be a symptom of some injury, and admitted that a fall, such as described, might produce a blood clot; that blood clots are sometimes absorbed, and sometimes remain, forming a scar tissue, and that, when scar tissue exists in a nerve, there is an interference with the transmission, which might affect either motor or sensory action of the muscles which the nerve supplies. This doctor also expressed his opinion, based on his examination of plaintiff, that he found nothing that would prevent plaintiff from engaging in almost any kind of employment, including that of a train dispatcher; stated that a man subject to severe headaches, even migraine, could act, safely to the public, in such position.

The doctors offered by the plaintiff based their conclusions

on their examinations of the plaintiff from the time of the injury and thereafter, and also upon the treatment that was given plaintiff during that period. They expressed their opinion that the plaintiff is permanently disabled, and that the plaintiff could not possibly carry on a remunerative occupation as long as conditions then existing continued to exist. Plaintiff's doctors had the benefit of X-ray photographs, and one of these doctors had specialized in spineograph X-ray work. One of the plaintiff's doctors was a member of both schools of therapy. He made an examination of the plaintiff in May, 1928, and found a paralysis of the left leg and an anaesthesia area to the left of the sacrum. He testifies that his diagnosis at that time was hemorrhage of the spinal cord at the lower part, beginning possibly at the junction of the dorsal with the lumbar region; that a clot would produce pressure on the nerve filaments, and this in turn would produce a partial paralysis, which later might become more or less permanent. He testified that plaintiff had been under his observation since May, 1928, and that, at the time of the trial, he saw no reason to change his first diagnosis.

The two doctors offered by the defendant had a strongly implanted idea that the plaintiff is a simulator of disability, in order to secure pecuniary benefits from the defendant company. We find otherwise, and we discover no reason to disturb the finding of the trial court for want of evidence on the part of the plaintiff, who had the burden.

The appellant apparently relies on certain decisions of this court: to wit, *Lyon v. Railway Passenger Assur. Co.*, 46 Iowa 631; *Hurley v. Bankers Life Co.*, 198 Iowa 1129; and *Corsaut. v. Equitable Life Assur. Soc.*, 203 Iowa 741. The provisions in the contracts under consideration therein differ radically from the contract provision in the present case. In the *Lyon* case, supra, the company agreed to indemnify the assured against loss of time, not exceeding 26 weeks, while he was totally disabled and prevented from the transaction of all kinds of business solely by reason of bodily injury. The contract was purely an indemnifying contract for a certain stated loss: to wit, loss of time for a limited period. In the *Hurley* case, supra, the contract provided that, if the insured became totally, permanently, and incurably disabled, and was thereby prevented permanently, continuously, and wholly from performing any work or following any occupa-

tion, the company waived payment of premiums thereafter. The insured was not indemnified against loss of time for any period, and the benefit accrued only under the express condition that the disability was permanent, total, and incurable. The inclusion of the word "incurable" is the deciding factor. When once such fact—incurable condition—is proven, there can be no change thereafter affecting the agreement, even if a miracle occurred. In the *Corsaut* case, supra, if the insured became totally, permanently, and incurably disabled, and was thereby prevented permanently, continuously, and wholly from performing any work or following any occupation for compensation or profit, the company waived the payment of premiums thereafter. This language followed that used in the *Hurley* case, supra, and the *Hurley* case was controlling.

We will not repeat the language of the policy in the case at bar, but it is shown that the furnishing of proofs is an element to be considered, and that proof is that the insured has been disabled for a period of not less than 60 days, and that such then existing disability *is presumably permanent*, but not an absolutely established fact; and that such presumably permanent disability does wholly and continuously prevent the insured from pursuing any gainful occupation at the time in question. It is plain that the established total disability for a period of not less than 60 days is required by proof, but also the absolute permanency and continuance of such disability must be established by later proofs; that, upon the furnishing of the first proof, the insured is entitled to a temporary grant of benefits promised. In the construction of the contract in the instant case, as heretofore given, it is shown that the very language of another clause sustains this point. In the *Lyon, Hurley,* and *Corsaut* cases, supra, this court was not required to take into consideration the fact that the insurance company had by its own volition set a comparative standard for measuring total and permanent disability as respects the ability to pursue any gainful occupation. In the instant case, we are compelled to take such comparative measure into consideration. We are not receding from our former holdings, but, by reason of the difference in the language of the contract in this case, the above cases relied upon by appellant are not controlling.

We reach the conclusion, therefore, that the trial court

correctly ruled the cause. The appellee did sustain the burden of proof which rested upon him on the issues of this case. There can be no criticism of the nature or of the extent of the relief granted, to which appellee is entitled. The decree entered is, therefore,—*Affirmed.*

FAVILLE, C. J., and STEVENS, ALBERT, MORLING, and WAGNER, JJ., concur.