Margaret C. Hanon, Appellee, v. Kansas City Life
Insurance Company, Appellant.

Gen. No. 8,686.

Opinion filed January 16, 1933.

HOGAN & COALE and JOS. R. STEWART, for appellant; FRANK W. MCALLISTER, of counsel.

PROVINE & WILLIAMS and HERSHEY & VOGELSANG, for appellee.

MR. PRESIDING JUSTICE ELDREDGE delivered the opinion of the court.

Margaret C. Hanon, appellee, recovered a judgment of $5,297.22 against Kansas City Life Insurance Company, appellant, as the beneficiary of a life insurance policy issued upon the life of her husband, John E. Hanon.

Mrs. Hanon owned a farm in Christian county and resided thereon with her husband up to the time of his death. The policy sued on was issued June 18, 1926, and the amount thereof is $5,000. Among the provisions in the policy is the following: ''After one full annual premium has been paid and before default in the payment of any subsequent premium, if the insured shall furnish satisfactory proof of total permanent disability caused by bodily injuries or disease and will be continuously and wholly prevented thereby, for life, from pursuing any and all gainful occupation, and if such proof of disability is received by the Company prior to the insured having attained the age of sixty years, the Company by an indorsement in writing upon this policy, will agree to pay for the insured the premiums, if any, which shall thereafter become payable during the continuance of such total disability. In any such case the premium so paid shall not be a lien on this policy or charge against the insured, and the cash loans and values of this policy in the table on the second page hereof shall increase in the same amounts as if the premiums were being paid by the insured.

''The Company may from time to time require of the insured due proof of the continuance of total disability, and upon failure to furnish such proof, or if it appears that the insured has engaged or become able to engage in any occupation whatever for remunera-

tion or profit, no further premiums shall be paid by the Company."

Upon an inquest held in the county court of Christian county, John Hanon was found to be insane on December 22, 1927, and was sent to the State Hospital for the Insane at Jacksonville, Illinois, where he remained for about six months when he was discharged on parole and returned to his home on the farm where he died January 20, 1931. Appellant filed a plea of general issue with notice of the special defense that the policy had lapsed for the nonpayment of premiums before the death of John Hanon. Two questions of mixed law and fact are presented for determination: (1) Was there such a total permanent disability caused by bodily disease that continuously and wholly prevented him for life from pursuing any and all gainful occupations; (2) whether proof of such disability was received by the company?

Dr. W. W. Eichelberger was in charge of the receiving service of the State Hospital at Jacksonville when Hanon was admitted and testified that he was suffering from dementia praecox of the paranoid type; that this is a mental condition that particularly leads to mental delusions—thinks people are talking about them, that their work is being interfered with, that they are being spied upon, that their wives are untrue to them and that they become homicidal; that Hanon's idea was that his mother and his wife were always interfering with his work, his neighbors spied upon him and interfered with his work, and his violent temper became extraordinarily combative and destructive; that a person thus afflicted is considered to be of the most dangerous of insanity cases because he so frequently becomes homicidal; that it is not curable and is progressive; such people lose all idea of judgment so far as everyday life is concerned; Hanon was disabled by his mental condition to such an extent that his delusions

incapacitated him from applying himself as he should to his everyday work; his ability as to continuous effort would be very poor; he was paroled because the superintendent thought it was safe to let him out; the superintendent is now dead; he was paroled to give him a trial at home to see if his condition would remain satisfactory at home.

Dr. W. A. Monaghan testified that he was Hanon's family physician and saw him frequently; his symptoms were retardation, slow thought, and very definite delusions of persecution, homicidal tendencies, destroyed furniture, not hardly a human being, had sort of tantrums sometimes inflicting very serious injuries on members of his family for which he afterwards treated them; he had dementia praecox of the paranoid type; it is one of the most serious cases of insanity and considered incurable and becomes progressively worse; he had very little capacity for continued and sustained effort; the symptoms were there practically all the time; after his return from the hospital his symptoms were considerably accented, condition became worse; he was in my opinion not a single time without these delusions; they were always present.

Dr. E. E. Burton testified that he was assistant manager of the Jacksonville State Hospital but did not go there until after Hanon was discharged; from the fact stated in the hypothetical question he was afflicted with dementia praecox, paranoid type, the progress of which is toward mental delirium all the time and is not curable; delusions would prevent such a person from pursuing the active life of a farmer and performing work in an intelligent manner and would be a dangerous man to deal with; there is no treatment, only supervision; when confined to the institution the treatment is occupational, therapeutic, which would be an aid if you could keep them at regular work; the trou-

ble is you cannot keep them at it, cannot keep them occupied because their minds are full of delusions.

Roy Tackett, a farmer and assistant supervisor of the township in which Hanon resided, knew the latter in his lifetime 10 or 12 years; lived part of the time less than a quarter of a mile east of him; frequently saw him; talked with him two or three times a week; noticed he had an unusual and abnormal condition and a difference in personality most any time you met him; talked pretty well at times, then drifted off to something else, changed to another subject with a kind of silly laugh; had a glassy stare in his eyes; told me his neighbors were working against him, and that they would go over and break tile in his fields causing water to stand thereupon and poison his cattle; this occurred nearly every time he talked to him; he never did anything on the farm line intelligently; at harvest time he would draw his binder through the field when water and mud were up to the axle, then unhitch from the binder and go to the house; he claimed that plowing corn once was better than three or four times and did not plow his corn regularly more than once and sometimes in parts he did not plow at all; saw him go out to plow his garden with a big tractor; he changed teams three or four times a day at different employment; he used a three-bottom plow with one board running six or seven inches deep and the other just simply turning the dirt; saw him unhook from a tractor plow and hook up to a gang plow with four horses; he drilled wheat when part of the drills and flutes would not be running and the crops would be a failure; he started to cut oats with a binder when it was muddy and dragged the binder along the field for half a mile or more, left it on the far side of the field and drove back through the oats with the tractor; he would fire up his steam engine, run it around back and forth tooting the whistle sometimes for half a day in corn planting time; did not raise over half a crop on

the land because of the way he farmed it; these instances occurred more than once; in my opinion he was insane and not capable of carrying on successful farm operations during the period of time after he came back from the insane asylum until he died; his mental delusion was somebody was trying to persecute him with particular reference to his wife's family and his brother-in-law.

Clarence Calloway, another farmer living on land adjoining Hanon's, testified that he would see him nearly every day and talk with him and that he complained that his neighbors were stealing his tools, digging holes down in his tile and tearing up his machinery; he cut oats when it was too wet and the water was standing in the fields; he drove the tractor clear across the meadow cutting ditches clear along the field; saw him drilling wheat with the holes stopped up; plowed his corn twice and sometimes only once, said he thought he could raise good corn without plowing it; fact was he did not raise much corn and on the average did not raise more than half as much as the rest of us did; bought a threshing machine for $280 but never got it fixed so he could see it and would fire up the engine and run it around the lot and toot the whistle; he would laugh at you silly and would shut you off before you got half way through and start talking about something else; one day we were threshing at Beemer's and left about four o'clock; when we got to his house he cussed his neighbors and called them names, his eyes bugged out like tea cups; in my opinion he was insane and was not capable of carrying on a farm.

Charles McMillan, another farmer, who worked for Hanon in 1929, was employed to plow corn and help thresh and lived at the place; he testified that Hanon would sit down to the table, give a big laugh and look wild; never heard a person who was sane laugh like

he did; was flighty in his conversation, first one thing and then another; he plowed every other row and I asked him why he did that and he said he wanted to get it over with, didn't do any good to plow anyway; said the neighbors seemed to have it in for him and that they stole his tools; that he laughed part of the time and cursed part of the time; can't say I ever saw him do a full day's work; talked to him about the way he plowed his corn and he said he was going to let the corn go·to hell; think he was insane and not competent to operate a farm.

Another neighbor, Frank Lamb, living within 40 rods of Hanon and seeing him every day, testified to similar facts.

Mrs. Kate Hanon, the mother of John Hanon, testified that he came to visit her on a number of occasions and would come to the back door and talk with her;. on one occasion he asked her where he was born and when she told him that he was born in Christian county, he took hold of her and shook her until she thought he was going to kill her and if it had not been for her daughter, Margaret, he would have done so; he thought people were against him and asked her whether she was against him; thought she was against him, thought his wife was against him, thought his neighbors were against him; told her the people around there had poisoned his hogs; said they wanted to run him out of the country; every time he came to town to visit her he had these delusions; he would get to laughing and act like he did not know what he was doing; never was able to carry on a connected conversation with him; he was getting worse all the time; he would hit his wife; she knew he was insane; he was killed by being shot by Joe O'Hara.

Hanon was shot by O'Hara, his brother-in-law, to prevent him from killing his wife, the appellee.

It is undisputed that Hanon, after his parole from the State Hospital, did some work about the farm in

the manner described by the witnesses. There is also evidence that he exchanged work with a number of his neighbors at different times. There is further evidence that at intervals he and his wife borrowed money from the bank, also that he hauled some of his grain to an elevator and sold it but claimed that the grain dealer cheated him. He also at times paid his farm hand his wages. It must be remembered that appellee owned the farm and so far as we can ascertain from the evidence as abstracted, she always signed the notes with him when any money was borrowed from the bank, and the credit extended by the bank was undoubtedly to her and not to him. That he was insane and violently so cannot be, and is not, disputed and there is no evidence to the contrary, but it is claimed by appellant that his condition was not such as to constitute a total permanent disability which wholly prevented him from pursuing any and all gainful occupations within the terms of the policy because he did in fact do some work and transact some business. The judgment of the county court finding him to be insane has never been vacated and his natural condition as a person *sui juris* had never been restored. The presumption is that after a person has been adjudicated to be insane, the insanity continues, and the burden is upon anyone who asserts the contrary to prove it. This court in the case of *Missouri State Life Ins. Co. v. Copas*, 265 Ill. App. 478, in construing substantially the same language contained in an insurance policy, held that it did not mean that appellee must be 100 per cent deficient before he is totally and permanently disabled. In order to carry on any kind of business there must be an ability to make contracts. No contract can be enforced against an insane person. The term "total disability" as used in insurance contracts has been construed in many cases and has been defined in various ways by different courts, but the

great weight of authority, in our opinion, sustains our conclusions as announced in *Missouri State Life Ins. Co. v. Copas, supra.* We will not attempt to refer in detail to the holdings in these cases as it would extend this opinion to an undue length, but simply refer to them as follows: *Metropolitan Life Ins. Co. v. Blue,* 222 Ala. 665, 133 So. 707; *Kurth v. Continental Life Ins. Co.,* 211 Iowa 736, 234 N. W. 201; *Nelson v. Great Northern Life Ins. Co.,* 253 Mich. 351; *Pacific Mut. Life Ins. Co. v. McCrary,* 161 Tenn. 389; *United States Casualty Co. v. Perryman,* 203 Ala. 212; *Clark v. Travelers' Ins. Co.,* 94 Vt. 383; *Jacobs v. Loyal Protective Ins. Co.,* 97 Vt. 516; *Standard Accident Ins. Co. of Detroit v. Bittle,* 36 F. (2d) 152; *Aetna Life Ins. Co. v. Spencer,* 182 Ark. 496, 32 S. W. (2d) 310; *Fidelity & Casualty Co. of New York v. Getzendanner,* 93 Tex. 487; *Sherman v. Continental Casualty Co.,* 103 Cal. App. 518, 284 Pac. 946; *Metropolitan Life Ins. Co. v. Lambert,* 157 Miss. 759; *Mid-Continent Life Ins. Co. v. Hubbard* (Tex. Civ. App.), 32 S. W. (2d) 701; *Fidelity & Casualty Co. v. Joiner* (Tex. Civ. App.), 178 S. W. 806; *Lobdill v. Laboring Men's Mut. Aid Ass'n,* 69 Minn. 14; *Continental Casualty Co. v. Wynne,* 36 Okla. 325; *Great Eastern Casualty Co. v. Robins,* 111 Ark. 607; *Mutual Benefit Ass'n v. Nancarrow,* 18 Colo. App. 274; *James v. United States Casualty Co.,* 113 Mo. App. 622; *Hohn v. Interstate Casualty Co.,* 115 Mich. 79; *United States Casualty Co. v. Hanson,* 20 Colo. App. 393; *Turner v. Fidelity & Casualty Co.,* 112 Mich. 425; *Thayer v. Standard Life & Accident Ins. Co.,* 68 N. H. 577.

Our conclusion is that John Hanon was, during his period of insanity, of total permanent disability caused by disease and was continuously and wholly prevented thereby for life from pursuing any and all gainful occupations under the proofs as established by the evidence in this case.

The second question of law and fact as to whether satisfactory proof of the disability was furnished to appellant remains to be considered. It is contended by appellant that the obligation of appellant rests not upon the *disability* of the insured but upon the receipt of the company of *proof* of the disability and that there was no such proof. There has been much diversity of opinion not only in the State courts but in the federal courts in the circuit courts of appeals as to the proper construction of disability waiver clauses in insurance policies of the general character as that appearing in the policy involved in the case at bar. In the case of *Peoria Life Ins. Co. v. Bergholm,* 50 F. (2d) 67, the circuit court of appeals, in construing the provision of a policy similar to the one appearing in this case, held that such a provision could not be enforced unless proof of disability was made and that the liability of the insurance company rested not upon the fact of the disability of the insured but upon proof thereof having been made to the company. In the case of *Minnesota Mut. Life Ins. Co. v. Marshall,* 29 F. (2d) 977, the policy provided that if the insured, while the policy was in full force and effect, and without default in the payment of the premiums ''shall become totally and permanently disabled, as hereinafter provided, and shall furnish satisfactory proof thereof, the Company will waive the payment of premiums thereafter becoming due, etc.,'' and the court held that the obligation of the insurance company rested upon the fact of disability and not upon the furnishing of the proofs thereof. In the *Bergholm* case the Supreme Court of the United States granted a certiorari because of a supposed conflict of the law held in that case with that held in the *Marshall* case. In the opinion of the United States Supreme Court (*Bergholm v. Peoria Life Ins. Co.,* 284 U. S. 489), it was held there was no conflict in the opinions rendered by the circuit court

of appeals in the *Marshall* and *Bergholm* cases, stating in regard thereto: "The petitioners nevertheless, contend that this is enough to bring into effect the promise of the company to pay the premiums which became due after the disability began. In support of this contention, *Minnesota Mut. Life Ins. Co. v. Marshall, supra,* is cited. The pertinent provisions of the policy there, however, differ from those found in the policy here under consideration. There the policy that if the insured, while the policy is in force and before default in payment of premiums, 'shall become totally and permanently disabled . . . and shall furnish satisfactory proof thereof, the Company will waive the payment of premiums thereafter becoming due,' and that 'upon the receipt of due proof of total and permanent disabilities . . . the Company will waive the payment of all premiums thereafter becoming due.' The court held that the waiver took effect at the time of the disability, and did not depend upon the time when proof thereof was furnished.

"We do not need to controvert this construction of the words quoted, or question the soundness of the view of the court that the existence of the disability before the premium become in arrears, standing alone, was enough to create the waiver. In that view, the obligation to furnish proof was no part of the condition precedent to the waiver; but such proof might be furnished within a reasonable time thereafter. Here the obligation of the company does not rest upon the existence of the disability; but it is the receipt by the company of proof of the disability which is definitely made a condition precedent to an assumption by it of payment of the premiums becoming due after the receipt of such proof. The provision to that effect is wholly free from the ambiguity which the court thought existed in the Marshall policy." The provision in the policy mentioned in the *Bergholm* case is

substantially the same as in the case at bar and the obligation to furnish proof was a condition precedent to the waiver. This being true, it is necessary to determine whether such proofs of disability were made or whether there was a waiver by the company thereof. It is contended by appellant that no satisfactory proof of such disability was furnished. S. B. Bentley was the general agent of appellant at Taylorville. Appellee was placed upon the stand as a witness and testified that while her husband was in the 'State Hospital at Jacksonville she called upon Bentley at Taylorville to inform him of the fact that her husband was insane and confined in the State Hospital at Jacksonville and that she informed him of that fact. She was then asked this question: ''Q. I wish you would state what was said by you and what was said by Mr. Bentley in the several conversations about this matter?'' To the above question appellant objected, which objection was sustained. Thereupon counsel for appellee made the following offer of proof: ''We intend to show by this witness, that Mrs. Hanon went to the office of Mr. Bentley at Taylorville, Illinois, for the purpose of informing him that her husband was confined at the Jacksonville State Hospital for the Insane, at Jacksonville, Illinois. That she did in several conversations inform him of that fact; that Mr. Bentley told her that he would communicate with the Company in regard to this matter and let her know what was needed; that in substance he told her that he had not yet heard from the Company, and to call again, and when she did call again he told her that he would handle the matter for her and she need not worry any more about it. It referred to the disability of her husband and the proof. We submitted that proof to the Company.''

The court sustained an objection to the offer. We think the court erred in holding that appellee was an

incompetent witness to establish the facts mentioned in the offer. When she testified, her husband was dead. Her testimony did not pertain to any communication or conversations with her husband or between him and third persons. The conversation with the agent was not in regard to any knowledge which she had obtained by reason of her marital relations. The insanity of her husband was a matter of public record and that fact could have been proven by a large number of people. She went to the agent of appellant for the purpose of making the proof of her husband's insanity which she had a right to do regardless of her marital relations. If appellant's agent told her that he would look after the matter for her in accordance with the offer of proof, then she had done everything that was necessary to be done by her in order to make the proofs of her husband's condition. In the case of *Mahlstedt v. Ideal Lighting Co.*, 271 Ill. 154, it was held that a wife may testify, after the death of her husband, to facts coming to her knowledge from other sources and not by means of her situation as a wife, notwithstanding they related to the transactions of her husband, and numerous cases are commented on in that opinion. In the case of *Ingle v. Maloney*, 234 Ill. App. 151, it was held that a wife after the death of her husband could testify as to the facts of an automobile accident as she saw it while riding in the automobile which her husband was driving and which resulted in an injury to the plaintiff. In *Supreme Lodge Mystic Workers v. Jones*, 113 Ill. App. 241, it was held that a wife is not precluded from testifying to facts which came to her knowledge by means equally accessible to any person not standing in the relation of husband. In *Conner v. Conner*, 145 Ill. App. 608, it was held that a wife was not incompetent to testify to transactions occurring during the marriage except where the husband or wife are called to testify as wit-

nesses for or against each other. In *Carlson v. Johnson*, 184 Ill. App. 17, a wife was held competent to testify to transactions relating to an insurance certificate, such as the delivery of the certificate to her by her husband, the keeping of the certificate, the payment of dues and assessments by her, and the disappearance of the certificate while she was absent from home.

There is no rule under the common law nor any statute of this State which would make appellee incompetent to testify to her transactions with appellant's agent embraced in the offer of proof. Moreover, there was no other person in position to make such proof and request the abatement of the premiums. The proof offered having been excluded upon the objection of appellant, it cannot now complain of the lack thereof. *Hahl v. Brooks,* 213 Ill. 134; *Owen v. Crumbaugh,* 228 Ill. 380; *Nebergall v. Prudential Ins. Co.,* 193 Ill. App. 189; *Hepler v. People,* 226 Ill. 275; *Erickson v. Svete,* 200 Ill. App. 151; *Follett v. Illinois Cent. R. Co.,* 200 Ill. App. 289; *Dandurand v. Hydrox Co.,* 222 Ill. App. 267.

The result of this conversation between appellee and Bentley led to the following correspondence between Bentley and appellant:

"J. B. Reynolds, President,
Kansas City Life Insurance Company
The S. B. Bentley, Agency,
　　Central Illinois.
Taylorville, Ill., Jan. 19, 1928.
Kansas City Life Ins. Co. Kansas City, Mo.
Dear Sirs:
I have just been informed that Mr. John E. Hanon Insured under Policy No. 346225 was adjudged insane at the last term of court and if that is total disability under the meaning of his policy I presume he is entitled to the exercise of the total disability under his

policy. Please let me hear what the Company's attitude on a case of this character is.

Very truly yours,

S. B. Bentley.

(The Kansas Life Insurance Co.
  Received Jan. 21, 1928)''

''January 24, 1928

Mr. S. B. Bentley, Taylorville, Illinois

Dear Sir. Re: Policy No. 346225—John E. Hanon.

We have your letter of January 19th advising us that the above named insured has been adjudged insane.

In case the beneficiary desires to make claim for payment of the premium by the company under the disability clause of the above policy, kindly hand her the enclosed blanks upon which to submit evidence of disability. The wife may execute 'Insured's statement,' from him and sign her own name. We would also like to have a copy of the order adjudging Mr. Hanon insane.

Yours very truly,

SECRETARY'S OFFICE.

P. S. The next premium will not be due until June 18, 1928.''

''J. B. Reynolds, President,

Kansas City Life Insurance Company

The S. B. Bentley, Agency,

Central Illinois,

Taylorville, Ill. May 30, 1931

Mr. C. N. Sears, Kansas City, Mo.

Dear Mr. Sears:

Enclosed find letter just received from Mr. Harold Williams of the law firm of Provine and Williams attorneys for Mrs. John Hanon widow of Mr. John E. Hanon.

Mr. John E. Hanon was insured in the Company under policy number 346225 and had carried this policy for quite a while previous to his death.

There are some circumstances in connection with Mr.

Hanon's death and his interest in this policy that may encourage a lawyer to feel he could make a case of it in court.

Mr. Hanon was adjudged insane in 1928 and January 11, 1928 I wrote to you for blanks on which Mrs. Hanon could file proof of disability under that clause of his policy. There was no premium due under his policy until June of that year and before time for this to fall due Mr. Hanon had been released from the asylum and no claim was ever filed. When Mr. Hanon was released from the asylum he returned and lived with his family. His condition was not entirely normal it seems and he had frequent and violent quarrels with his wife threatening to kill her. His death was caused by being shot at the hands of his brother-in-law who was released on the grounds he did the act in defense of his sister and to save her life. I imagine plenty of witnesses could be secured to prove the above. On the other side however he transacted his business and secured the cash from this policy and no question of his legal right to do so was ever raised. I hope you will review this case and furnish Mr. Williams with the information he wishes as I am sure he is not desirous of bringing any legal action if there are no reasonable grounds on which to base a suit.

Very truly yours,

S. B. BENTLEY.''

These letters strongly tend to sustain the truth of the facts offered to be proven.

Appellant denied any liability under the policy on the sole ground that the policy had lapsed at the time of the death of the insured. This made it unnecessary to furnish any proofs of death.

What we have said in the above opinion disposes of most of the criticisms made to the action of the court in the giving and refusing of instructions and we find no reversible error in regard thereto.

. The judgment of the circuit court is affirmed.

*Affirmed.*