RICHARD A. WOOD, Appellee, v. FEDERAL LIFE INSURANCE COMPANY, Appellant.

No. 43948.

JANUARY 18, 1938.

REHEARING DENIED MAY 13, 1938.

Grimm, Elliott, Shuttleworth & Ingersoll and Will J. Hayek, for appellant.

Raymond N. Klass and Messer & Cahill, for appellee.

RICHARDS, J.—On June 18, 1928, defendant issued a policy of insurance upon the life of plaintiff. Additional to undertakings to pay, in event of the death of plaintiff, a sum dependent on his attained age, the policy contained the following provisions:

"TOTAL AND PERMANENT DISABILITY BENEFITS

"It is agreed that, after this policy shall have been in force for one full year, if the Insured before attaining the age of 60 years and while insured hereunder becomes totally and permanently disabled by bodily injuries or disease, so as to be continuously and wholly prevented thereby for life from engaging in any occupation or performing any work for compensation or profit, he shall be deemed to be totally and permanently disabled.

"After the expiration of a period of six months of such total and permanent disability and upon receipt at the Home Office of the Company while this policy is in force of proof of such disability satisfactory to the Company, no further premiums will be required and in lieu of all other benefits the Company will pay the amount of the insurance in force upon such life at the time of receipt of such proof under either of the following options as may be elected by the Insured:

"1. Payment to the Insured in one sum.

"2. Payment in five annual installments, each installment to be one-fifth of the amount of insurance as above defined and with the second and each succeeding installment payment there shall be included interest on the unpaid portion of insurance calculated at $3\frac{1}{2}\%$ per annum."

Upon these quoted portions of the policy this action was bottomed and tried in the district court, plaintiff not being at that time deceased, but allegedly totally disabled. Trial was had in June 1936, resulting in a verdict for plaintiff. Judgment thereon was rendered. Defendant has appealed.

■■■ The first contention presented is that the court erred in submitting to the jury the question whether or not plaintiff was totally and permanently disabled as contemplated by the terms of the policy. That plaintiff was disabled by disease is not disputed. The specific thing defendant claims is that the evidence was insufficient to warrant a finding that the disablement was total and permanent so that plaintiff was continuously and wholly prevented for life from engaging in any occupation or performing any work for compensation or profit.

The evidence, the sufficiency of which in the respect mentioned is thus challenged, has to do in its more important aspects with the period of time beginning on November 11, 1931, and continuing on down to the time of the trial of the case. For a better understanding of the record covering that period it should be stated that plaintiff was 15 years of age when the policy was issued and had reached the age of 22 years at the time of the trial. He had lived in his mother's home since birth. Plaintiff's stepfather became a member of the family in 1929 when the mother remarried. The family resided in Iowa City. The stepfather operated a small· shop. The mother was employed in a hotel in a clerical capacity from September 1922 until October 1935. Plaintiff had no occupation other than attending school.

The beginning of plaintiff's illness was in 1929. Dr. Wolfe, connected with the University Hospital, was in observation of plaintiff's condition. He testified it remained almost stationary for awhile. But on November 11, 1931, plaintiff was so severely stricken that on the following day he was taken to the Childrens Hospital in Iowa City. There it was ascertained that he was suffering from osteomyelitis of the vertebrae of the spine. This disease is described in the record as being a breaking down or infection extending through the periosteum or covering of the bone, and through the harder part of bone structure into the medullary cavity or softer inner portion, the disease involving the entire structure of the bone affected. The bone breaks down and sloughs away. The spinal cord being within the vertebrae

that were affected in plaintiff's case, curettage of the diseased portions was liable to cause pressure on the cord, and paralysis.

During three months of plaintiff's hospitalization commencing in November 1931 operations were performed. Among other things done three separate incisions were made to provide openings in his back and left hip for drainage from the diseased vertebrae. Ever since the making of these incisions the exuding of waste matter and pus from the sloughing vertebrae has been constant down to the time the case was tried. An offensive odor characterizes the discharge, to minimize which frequent dressing of the wounds is required. In the early part of 1932 plaintiff was removed from the hospital to his home. During 1932 he was returned to the hospital for short periods. After being kept in bed almost continuously, beginning in November 1931, plaintiff was able to get about the house by using wheel chair and crutches in the latter part of April 1933. He was unable to raise his body to an erect posture, a deformity having been caused, or to walk, except in a shuffling manner for short distances, as across a room. Any walking caused pain and fatigue. He became more adept in use of the crutches and on a few occasions walked with them seven blocks to his stepfather's shop. Later in 1933 he drove the family automobile, on one occasion in September of that year driving from Iowa City to Chicago. Other trips were to Cedar Rapids. When using the automobile he always had the crutches with him in the car. In December 1933 he was returned to the hospital for nearly a month, and was bedridden until February 1934. Later in 1934 plaintiff frequently took his mother in the automobile to her place of employment, several blocks from the home and then transported himself to school. During the summers of 1934 and 1935 plaintiff on days when he was not too ill transferred sums or totals from the day book to the ledger and entry book, at his stepfather's shop. An hour was the maximum time consumed on any one day in so doing and a davenport was used by plaintiff to lie upon when at the shop. Until October 1935 the mother and stepfather were employed. Consequently during the daytime plaintiff, usually at the home, was alone. He testified that being unable to do any work, rather than stay at home by himself, and against the advice of his physician, he registered in the Liberal Arts College of the State University as a student in September 1934. Frequently during this school year his illness

compelled plaintiff to absent himself from classes, and often to return home before completion of the two or three hours attendance. Many quizzes and some examinations, on the result of which largely depends the crediting to the student of passing grades, were not attended. According to the record that is before us it appears that there was in a large measure a recognition of the indomitable spirit displayed by this young man, than of scholastic accomplishments, in the according to him of passing grades for this school year. Again in September 1935 he entered the College, but as the second semester approached he realized he was unable to carry the ordinary work and during the last half of the year he reduced his hours by about one-half.

Before further setting out the record, it may here be said that it is upon plaintiff's attendance at the university, his helping his stepfather at the shop, and the driving of the automobile, that defendant largely relies for support of its claim that plaintiff clearly was not disabled within the intendment of the contract contained in the policy. The authorities cited by defendant include Lyon v. The Railway Pass. Assur. Co., 46 Iowa 631, a case in which the policy provided for indemnity of $15 per week for not exceeding 26 weeks while the assured should be totally disabled and prevented from the transaction of all kinds of business, solely by reason of bodily injuries effected through outward and accidental violence. Plaintiff only claimed the disability continued for nine weeks. In McKinley v. Bankers Acc. Ins. Co., 106 Iowa 81, 75 N. W. 670, there was involved a similar accident policy, insuring against bodily injuries caused solely by external violent or accidental means. The policy provided for weekly indemnities for not to exceed 52 weeks while insured might be wholly disabled from transacting any of the duties of his occupation as a merchant. Plaintiff claimed only 8 weeks of such indemnity. In Elmore v. Southern Surety Co., 207 Iowa 872, 224 N. W. 32, the policy insured against the effects from bodily injury sustained through external violent or accidental means, providing for an indemnity of $25 per week for not exceeding 26 weeks, while the insured might be wholly disabled. We held the total disability continued for only 13 weeks. In Hurley v. Bankers Life Co., 198 Iowa 1129, 199 N. W. 343, 346, 37 A. L. R. 146, plaintiff claimed he had been totally, permanently, and incurably disabled as the result of being kicked by a horse, necessitating amputation of one leg, leaving a stump such

that an artificial limb could not be used. Plaintiff was a farmer. It was shown that notwithstanding the amputation, thereafter he was able to drive a team if harnessed and to do some chores on the farm. It was held that it did not appear that appellant was prevented from "permanently, continuously, and wholly performing any work or following any occupation for compensation or profit", within the meaning of the policy in that case.

In determining the extent to which total disability was a jury question, a factor in each of the above cases was this: The disability had been caused by some external violence, injuring the body of the insured. The maximum of disability was at the time of the injury. So far as nature was able the damage became mended—there was a recovery by insured of normal health and condition, save such physical damage as was not possible of repair. It was after the condition of body had improved through nature's processes, and the insured restored to his previous condition, save such physical damages as nature did not mend, that the question of total disability arose in each of the foregoing cases. In the case before us there easily might be a similar approach to the question of total disability if, for instance, plaintiff's disease had responded to treatment to the extent of a staying of further breaking down and infection of the vertebrae, and a restoration to ordinary physical condition leaving only the handicap of the deformity of body that had been brought about. However, such conjectural condition does not here exist. There was no cessation or arresting of plaintiff's malady. On the contrary, from as early as November 1931 down to the time of the trial, a period of nearly five years, the infection and breaking down of plaintiff's body was constant, the vertebrae progressively disintegrating and sloughing away. The evidence is that during all the mentioned period the physical degeneration was incurable. It grew worse as time went on. The progress was downward. A continuous dull ache in his hips required plaintiff to lie down the greater part of the daytime. A sitting position sustained not for long so increased the pain, bringing on a sickly feeling all over plaintiff's body, that a recumbent position became a necessity. After two or three hours of use his eyes became sore and tired. In the opinion of the physician who observed plaintiff, during the entire period there was an absorption of the pus constantly thrown out, resulting in a fixed toxic condition affecting the organs of plaintiff's body,

and he was sick enough to have been properly a patient in bed. A continuing and extensive enlargement of the liver, during the entire period after November 1931, was shown to have been one of the results of the constant toxic condition.

Consideration of the matters in evidence, that briefly have been set out, leads to the view that not all reasonable minds would conclude therefrom that plaintiff was not totally and permanently disabled by disease within the contemplation of the contract into which the parties entered. The distinction has been pointed out that in many of our cases where there had been traumatic injuries, followed by restored normal physical condition, the insured became enabled to carry on as before, except to the extent of unrepaired bodily damage. In the instant case the jury could have found that there was at no time even partial restoration of normal physical condition, and that the downward trend of the disease persisted, with variance at times of severity of manifestation. From the undisputed facts, and the physician's unchallenged testimony, we cannot say less than that reasonable minds might differ on the question, whether there was such degree of chronic invalidism that plaintiff should have been in bed and wheel chair, or, as defendant contends, could have been at work. If a jury adopted the first alternative we have found no authority warranting a holding that the insurance contract of the parties contemplated that plaintiff, an invalid to the extent shown, nevertheless was one to be included in the classification of those who work and earn. It cannot be that ordinary acceptance of what is human and humane was not within the contemplation of the parties when they entered into the policy agreement.

▌▌▌ There is another and quite specific reason that the evidence warranted a finding that the disability of plaintiff was to the extent contemplated by the parties. It is found in express provisions in the policy that tended to refute appellant's contention that the disability of plaintiff is to be determined by a literal construction of the description of disability as contained in the insuring clause, to wit, such disability that the insured be continuously and wholly prevented for life from engaging in any occupation or performing any work for compensation or profit. Reference is to the following portion of the policy in suit:

"Without prejudice to any other cause of disability, the entire and irrecoverable loss of the sight of both eyes, or the severance of both hands at or above the wrists, or of both feet at or above the ankles, or such loss of one entire hand and one entire foot, will be considered total and permanent disability within the meaning of this provision."

In Kurth v. Continental Life Ins. Co., 211 Iowa 736, 742, 234 N. W. 201, 204, apropos of practically the same provision in the policy involved in that case, we said:

"It is common knowledge that in none of these stated causes of disability would the unfortunate victim be wholly and continuously prevented thereby from pursuing any gainful occupation. Persons so afflicted are seen on frequent occasions, engaged in various employments whereby they earn a livelihood, without resorting to the near-beggary vocation of selling papers, pencils, and shoe strings in public places. It is apparent by this clause, inserted upon the volition of the company, and not at the request of the appellee, that it was never intended that the insured be rendered absolutely helpless and continue to be absolutely helpless before becoming entitled to the benefits promised. If it were otherwise, then the appellee must suffer also a destruction of his mental faculties, as well as his physical functions."

The above quotation had reference to a policy requiring that the insured be wholly and continuously prevented from pursuing any gainful occupation. Thus in the instant case as in the Kurth case, in weighing the evidence as to the extent of the disability, heed must be given that the insurance company of its own volition "set a *comparative* standard for measuring total and permanent disability as respects the ability to pursue any gainful occupation." (Italics supplied.) So measured, the total and permanent disability, as in the Kurth case, was properly a question for the jury. In considering the question we are also of the opinion that the jury could have looked upon the undisputed physical condition of plaintiff as not put in question, in any serious manner, by the evidence of his activities. This youth was stricken at a time in life when invalidism is an appalling thing, often met with an unreasoning struggle of resistance, seldom with resignation to the inevitable. Avoidance of loneliness was another urge. Much he did was contrary to physician's

advice. His efforts to attend college classes exhibit his determined effort, but the extent of the accomplishment likewise indicates his invalidism. As said in Corsaut v. Equitable Life Assur. Soc., 203 Iowa 741, 211 N. W. 222, 51 A. L. R. 1035, the question whether or not an insured became wholly and permanently disabled might, under many circumstances very properly be one for determination by the jury. The whole record leads to the holding that in the instant case the question was not one for the court, but within the jury's realm.

**∎∎∎** One of the facts necessary of proof by plaintiff was that the monthly premium of one dollar due defendant on August 16, 1933, was paid. Defendant claims there was error in submitting to the jury this question of payment, because of insufficiency of the evidence. The mother of plaintiff testified that on approximately August 15, 1933, she posted a duly stamped letter in the U. S. mails at Iowa City, directed to defendant at its Chicago address, and that the letter contained three dollar bills placed between cards, in the envelope. The cards enclosed, furnished by defendant, identified the remittance as being 3 premiums of one dollar each due in August upon three policies, one being plaintiff's, one the mother's and the third plaintiff's sister's policy. In same manner plaintiff's mother had remitted currency to defendant for monthly premiums on these policies since the closing of the banks in March 1933 had deprived her of use of her checking account. This witness testified that she had present personal knowledge and recollection of all these matters of testimony. On cross-examination she related that shortly after making the remittance she had remarked that she could safely go on the sky ride at the Chicago fair because her insurance was paid. But the jury could well have accepted the statement of the witness that recollection of the remark was offered, merely as something additional to her recollection of making the remittances. There was sufficient evidence to warrant submitting the question of making the remittance.

Defendant, to show the remittance did not reach its Chicago office offered the testimony of three of its office employees. They described defendant's office practices, and the manner of making the record of receipts of premiums upon many thousands of policies similar to plaintiff's. These records being produced the payment of the August 1933 premium upon plaintiff's policy

did not therein appear. Other than that defendant's records were as just stated, these witnesses disclaimed any information regarding the payment or nonpayment of this premium. They testified further that after letters containing remittances for premiums reach defendant's offices they are machine opened, and then go into the hands of employees who remove the contents from the letters. It is the usual practice that these employees sort the contents of the letters, but without making any records of any letter or its contents, and then send the remittance with the accompanying identification or receipt card to other employees who then make the record of the payment of the premiums, being the record referred to above in this paragraph as having been produced by defendant's three witnesses. Until these latter employees make their entry there is nothing in defendant's records to show that a letter containing a remittance was or was not in fact delivered at its offices. Remittances are received by mail in currency, checks, money orders and postage stamps. From the testimony of these witnesses it also appears that in case a remittance is lost or abstracted between the time it comes into the hands of the employees who take the contents from the letter, and the time the contents may in ordinary routine reach the desk of the employee whose duty it is to enter the record of the payment, there would be no way to ascertain from defendant's records, that the remittance did or did not reach its offices, or the hands of its employees who took the contents from the letters. The department head testified that if money came in a letter and was lost with the card before being taken to the desk of the posting clerk and getting on the records the witness would have no knowledge of the money being received. The personal information of the other witnesses offered by defendant went no further than that of the department head. None of these witnesses, though one was the department head, had any information as to the identity of the employees who were removing the contents of remittance letters in August 1933, these employees changing from time to time, nor was testimony offered of any such employees. The jury could also have found from the evidence that upon an earlier occasion plaintiff's mother had remitted a month's premium on the same three policies, accompanied with the usual identifying or receipt cards, and that the cards were lost in defendant's office, new cards being substituted by defendant for those so

lost. On September 21, 1933, defendant mailed a letter to plaintiff stating that his policy had lapsed for nonpayment of the August premium. On September 23, 1933, plaintiff's mother replied by letter, stating that she had made remittance for three premiums including plaintiff's on August 15, 1933, in the manner shown in her testimony already set out. To this letter defendant replied by letter of September 28, 1933, stating that defendant had made a thorough investigation and had found no evidence of having received the remittance, and that defendant regretted the remittance had been made in the form of currency inasmuch as there is no way in which defendant can aid in tracing.

Upon this record it was a question to be determined by the jury whether remittance for the August premium was made and reached defendant. DeBolt v. German American Ins. Co., 181 Iowa 671, 165 N. W. 55; First Nat. Bank v. Way, 167 Iowa 426, 149 N. W. 503.

But it is urged by defendant that the evidence as to payment of the August premium was at best in a state of equipoise, and that plaintiff must fail because on him rested the burden of proof. Defendant relies upon Travelers Ins. Co. v. Farmers Mutual Fire Ins. Assn., 211 Iowa 1051, 1056, 233 N. W. 153, 156. In that case the defendant insurance company, though bound by its by-laws to give 30 days notice to the insured in person or by registered letter, before canceling a policy, in fact did neither of these things, but offered the testimony of its secretary that the notice was sent by unregistered letter. Under the testimony of the plaintiff no such letter was received by it. From the opinion;

"The conflicting testimony and the effect of it may be summarized in a word. If the defendant actually mailed such a letter, the probability is great that it reached its destination. On the other hand, if the plaintiff never received such a letter, the probability is great that it was never mailed. In that sense, the evidence for the plaintiff is directly contradictory to the evidence for the defendant. We may assume that one witness is as credible as the other. This only presents an illustration of the hypothetical equipoise, which seldom comes into being as a practical fact. In attempting to give the notice in the manner in which it did, the defendant wholly ignored its own by-laws.

It must, therefore, rest under the burden of proving actual notice to the plaintiff, and this it has failed to do.''

In the cited case, notice by registered mail not having been given, there was an agreement on part of defendant to give notice to the plaintiff ''in person.'' The opinion says a notice ''in person'' is actual notice. And it might be contended that in the foregoing authority the effect of the pronouncement may be that, where an insurance company *agrees* to give *actual notice,* the proof of the carrying out such agreement must be proof of the thing agreed, that is, proof of *actual notice,* evidence of anything less than *certain actuality* of *notice* being evidence of something impliedly agreed to be insufficient. But be that as it may, there is another distinction, that is, the cited opinion finds that the testimony of plaintiff that the letter was not received through the mail was positive, and that under plaintiff's testimony no such letter was ever received by it. In the instant case a jury would not necessarily find that defendant's evidence was of like positive nature, nor that under defendant's evidence the letter in question did not reach defendant's Chicago offices. The most that defendant can claim for its evidence is that its records show that the clerks who make entries of payments made none for plaintiff's August payment, together with evidence that there was an office routine in which other employees handle the remitted checks, money orders, or currency, and the identifying cards, before they reached the entry clerks, and the further evidence that the entry clerks made the records of payments solely from the remittances and cards as these reached their desks, following the prior routine of which prior routine no records were made. So the dependableness of its records, on which defendant relies, would be to the jury a variable factor, as it might or might not be shown that the employees who in the routine first handled the letters and contents performed their duties in an accurate and trustworthy manner, or otherwise. Though peculiarly a matter within its own knowledge, defendant seems to have offered no testimony in that respect, although its witness, the department head, on cross-examination admitted knowledge that other situations like this one have occurred, and there was the further evidence that plaintiff's original receipt or identification card had been lost in defendant's offices. Such being the record there is lacking in the instant case the absolute

denial of receipt of the letter that was found in the cited case, and it becomes immaterial in this case, whether, had there been an absolute denial of receipt of the letter, there would have been the "hypothetical equipoise" mentioned in that case. In the instant case the question of the receipt of the letter by defendant was for the jury's consideration and determination.

Plaintiff's policy provided that after expiration of six months of total disability as described therein, and upon receipt at the home office of defendant, while the policy is in force, of proof of such disability satisfactory to defendant, the company would pay to insured the amount of the insurance in force upon the life of insured at the time of the receipt of such proof. By the terms of the policy payment of the August 1933 premium would carry the policy in force until October 16, 1933. The jury was instructed that if they found by a preponderance of the evidence that the August 1933 premium was paid and received by defendant, and that defendant, prior to October 16, 1933, lapsed, terminated, or cancelled this policy because of its claim of nonpayment of such premium, and that plaintiff or his mother was made aware of such action of defendant and was led to believe that such policy was no longer in force, then under the law defendant has waived the requirements of the policy as to furnishing proofs of loss or disability, and failure on plaintiff's part to furnish such proofs would not prevent or preclude his recovery, and defendant cannot now insist upon the failure to furnish such proofs as a defense to this action. Defendant, claiming the August premium had not been paid, did on September 16, 1933, enter upon its records that the policy was lapsed. By letter dated September 21, 1933, defendant notified plaintiff that the policy was lapsed on account of nonpayment of the August premium. In a letter to defendant dated September 23, 1933, plaintiff's mother insisted that she had remitted the August premium on about the 15th of that month. To this letter defendant replied by letter of September 28, 1933, maintaining that the August premium had not been paid and that the policy was lapsed. Upon this record we cannot agree with defendant's contention that the instruction was erroneous. In this jurisdiction, as in many others, a denial of liability on grounds other than failure to furnish proofs of loss is a waiver of the right to require such proofs. Bloom v. State Ins. Co., 94 Iowa 359, 62 N. W. 810; Smith v. Continental Ins. Co., 108 Iowa 382, 79

N. W. 126; Stephenson v. Bankers Life Assn., 108 Iowa 637, 79 N. W. 459; Richardson v. Farmers Mutual, 214 Iowa 30, 241 N. W. 414; Dawson v. Bankers Life Co., 216 Iowa 586, 247 N. W. 279. What defendant did could be deemed nothing else than a denial of all liability from and after September 16, 1933, and was a waiver of the furnishing of proofs of loss thereafter though the policy still remained in force and proof could have been furnished. Fairgrave v. Ill. Bankers Life Assn., 211 Iowa 329, 233 N. W. 714, cited by defendant, recognizes the above-mentioned rule, and points out a limitation, that is, while an absolute denial of liability before the expiration of the time for making proof of loss operates as a waiver, on the other hand it is not so where the time for making proof of loss had actually expired when the denial of liability was made, and a right to rely on the failure to furnish proofs of loss had already accrued to the insurance company under the laws of this state. In the instant case if the jury found the August premium had been paid, the time for furnishing proofs had not expired.

■■■ In several assignments defendant urges that the court erred in failing to tell the jury the meaning of the provisions of the policy as to what constituted total and permanent disability for life, and in instructing the jury they must also find plaintiff was so disabled at time of the trial, citing Hawkins v. John Hancock Mutual L. Ins. Co., 205 Iowa 760, 218 N. W. 313, and Graham v. Equitable Assur. Soc., 221 Iowa 748, 266 N. W. 820, being cited. The instructions placed on plaintiff the burden of proving disability to the full extent described in the policy, and that it must be such as to prevent plaintiff for life from engaging in any occupation, etc., as stated in the policy. "For life" was surely inclusive of the time of the trial.

Several of the assignments of error are disposed of by the conclusions announced. Examination of the remaining assignments reveals no ground for reversal, except that it does appear that the verdict was in excess of the amount proven to be due as fixed by the terms of the policy. In September 1934 when demand on defendant was made, plaintiff's age having been 21, the then amount of recovery provided was $1399. The verdict was for $1421, for which amount with 5 per cent interest from October 16, 1933, judgment was entered. If within 30 days from the filing of this opinion there be remitted such portion of the judgment as is in excess of $1399 with 5 per cent interest per annum

from September 30, 1934, without disturbance of the judgment against defendant for the costs, there will be an affirmance. Appellant's motion to strike appellee's amendment to abstract is overruled.—Affirmed on condition.

STIGER, C. J., and ANDERSON, KINTZINGER, DONEGAN, MITCHELL, and HAMILTON, JJ., concur.